IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF PACKAGES LOCATED AT UPS DISTRIBUTION CENTER, 39 CORNWELL DRIVE, KEENE, NH | Case No. 24-mj-326-01-TSM<br><br><br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Bradley Nims, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations (HSI) and have been employed by HSI since April 2018.  I am currently assigned to the HSI Office in Manchester, NH. I have attended 22 weeks of specialized training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia where I graduated from both the Criminal Investigator Training Program (CITP) and the HSI Special Agent Training (HSISAT) program. I was provided formal training in multiple disciplines including money laundering, narcotics trafficking, and fraud investigations. Part of this training included the use of electronic communication devices to facilitate these crimes. I have a bachelor's degree in Criminal Justice and a master's degree in Security and Resilience Studies.

2.      In connection with my official duties, my investigations have involved the use of surveillance techniques and the execution of various search, seizure, and arrest warrants. I have investigated and assisted other agents in numerous cases involving a wide variety of criminal

violations including narcotics trafficking, money laundering, illegal importation/exportation of goods, bank fraud, mail fraud, and wire fraud. Based on my training and experience, I am familiar with the methods used by money launderers, including laundering proceeds that are part of large-scale organized schemes. I have received specialized training regarding investigative techniques, evidence collection, and evidence preservation. I communicate constantly with other agents, law enforcement officers, and intelligence analysts in both the private sector and the government to learn new information about current trends and activities associated with money laundering and fraud schemes.

3.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers, non-law enforcement retail investigators, and agents.  In addition, I have reviewed records and reports relating to this investigation.  Other law enforcement agents have similarly reviewed records and reports and relayed their contents to me.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

**<u>DESCRIPTION OF PACKAGES TO BE SEARCHED</u>**

5.      The property to be searched is a quantity of packages slated for delivery to ▌ ▌▌▌▌ Unit C, Wilton, New Hampshire ("SUBJECT PREMISES 2"), ▌▌▌▌▌▌ Floor 1, Rindge, New Hampshire ("SUBJECT PREMISES 4"), and ▌▌▌▌▌, Unit B, Rindge, New Hampshire ("SUBJECT PREMISES 5"), which arrived to FedEx and UPS in the days following the execution of a search of the SUBJECT PREMISES on November 20, 2024.

6.      These packages list A.I., 102 Goodman Drive, Carlisle, PA 17013 as the return address.  This is a known shipping center for Apple.

7.    The packages are being held at FedEx and UPS distribution centers in New Hampshire. FedEx packages are being held at 10 Industrial Drive, Londonderry, New Hampshire. UPS packages are being held at distribution centers located at 3 Whipple Street, Nashua, New Hampshire, and 39 Cornwell Drive, Keene, New Hampshire.

8.    Based on my training and experience, and the facts set forth below, there is probable cause to believe that the packages being held by FedEx and UPS contains evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 1341, 1343, 1349, 1956, and 1957 (mail fraud, wire fraud, money laundering, and related conspiracies) (the "TARGET OFFENSES").

## PROBABLE CAUSE

9.    On or about November 15, 2024, United States Magistrate Judge Andrea K. Johnstone issued search warrants authorizing the search of the following related locations:

a.    The entire premises located at ███████████, Unit 3, Jaffrey, New Hampshire ("SUBJECT PREMISES 1"), see Docket No. 24-mj-306-01-AJ;

b.    The entire premises located at ███████████, Unit C, Wilton, New Hampshire ("SUBJECT PREMISES 2"), see Docket No. 24-mj-307-01-AJ;

c.    The entire premises located at ███████████, Unit 6, Troy, New Hampshire ("SUBJECT PREMISES 3"), see Docket No. 24-mj-308-01-AJ;

d.    The entire premises located at ███████████, Floor 1, Rindge, New Hampshire ("SUBJECT PREMISES 4"), see Docket No. 24-mj-309-01-AJ;

e.    The entire premises located at ███████████, Unit B, Rindge, New Hampshire ("SUBJECT PREMISES 5"), see Docket No. 24-mj-310-01-AJ;

f.    a white 2021 Audi Q7 bearing New York license plate number KLN 4770 and

3

vehicle identification number ("VIN") WA1LXAF74MD029822 ("TARGET VEHICLE

1"), s*ee* Docket No. 24-mj-311-01-AJ;

g. a white Ford Transit van bearing New Hampshire license plate 533 9987 and

VIN 1FTBR2C85PKC01628 ("TARGET VEHICLE 2"), s*ee* Docket No. 24-mj-312-01-

AJ;

h. a white 2023 Mazda CX-5 bearing Massachusetts plate number 3MLG97 and

JM3KFBBM0P0148640 ("TARGET VEHICLE 3"), s*ee* Docket No. 24-mj-313-01-AJ;

i. Jian LIN ("J. LIN" or "Harley"), an Asian male born ███████ 1987, who is

listed as 6'0", weighing approximately 170 pounds, and having black hair and brown

eyes, *see* Docket No. 24-mj-314-01-AJ;

j. Jianxu REN ("J. REN"), an Asian male born ███████ 1993, who is listed

as 5'8", and having black hair and brown eyes, s*ee* Docket No. 24-mj-315-01-AJ; and

k. Jianxiong REN ("JX REN"), an Asian male born ███████, 1998, who is

listed as 5'11", weighing approximately 150 pounds. *See* Docket No. 24-mj-315-01-AJ.

10. On November 20, 2024, law enforcement officers were able to execute most of

the search warrants. In executing the warrant on SUBJECT PREMISES 3 (███████,

Unit 6, Troy, New Hampshire), officers found that that unit was connected through a large

opening in the wall to Unit 7 at the same address. This picture, taken from inside SUBJECT

PREMISES 3 shows the connection between the two units:



11.     Although the units have different front doors, only Unit 6 has a back door with a loading dock. From inside Unit 6, agents can clearly see that various packages, both open and closed, are strewn inside both Units 6 and 7. It appears that both units were used jointly for the operation described below. In addition, in J. LIN's application for a nearby PO Box (as discussed in more detail in Paragraph 50), he identified his address as ███████████, Unit 6 and 7, Troy, NH.

12.     During the execution of the warrants, J. LIN spoke with investigators and stated that he controls both Units 6 and 7 at ███████████ and that he conducts his own shipping business from these locations.  On November 20, 2024, J. LIN provided consent to search Unit 7.

13.     Based upon my training and experience, conversations with other law

enforcement, and knowledge of other investigations, I am aware that a common tactic within Organized Retail Crime (ORC) includes the exploitation of stolen and/or fraudulently-obtained gift cards to make purchases of high-valued merchandise, such as Apple brand electronics and cell phones. This merchandise is then in turn sold to others in the United States and abroad. The end-purchaser(s) of these devices typically have no knowledge of the original fraud. The proceeds generated from the final sale of the electronics to the consumer obfuscates the origin of the illegally-obtained funds used to purchase the merchandise.

14.    While there are varying levels of sophistication and methods of conducting these scams, one such method involves the coordinated efforts of entering a retail establishment and stealing hundreds, if not thousands, of inactive gift cards from their display racks. The gift card number, PIN number, and other pertinent information are recorded into a computer program that repeatedly checks the retailer's website to determine when a customer makes a legitimate purchase of the compromised card by adding money to it. The card is then subsequently either repackaged or restored to its original condition and brought back to a retail establishment and placed back on the shelves for sale.

15.    At this point, an unsuspecting customer will select a gift card off the shelf, add funds to it at checkout, and leave the store. Once the program tips off the fraudster that the gift card has been loaded with money, the card details are either used in an online purchase or electronically disseminated to co-conspirators who are sent to make in-person purchases at retail locations. The original physical gift card is not necessary for use by co-conspirators as the pertinent information has been obtained and can be transmitted to other co-conspirators' electronic devices, such as cell phones. High value electronic items such as Apple iPads, iPhones, and computers are often purchased and brought back to a central location for

distribution and resale.

16.     Another method utilized in these schemes involves the utilization of stolen funds or proceeds of illicit activity (such as hacking) to purchase physical or electronic gift cards. These gift cards are then used online or disseminated to individuals who are sent to make purchases online or at physical retail locations.  This is a form of money laundering, as the gift cards conceal the source of the illicitly obtained funds.  Using gift cards raises less suspicion than using bulk currency to make large volume purchases of high-value electronic items. Similarly, by using gift cards, fraudsters can avoid using credit cards which are linked to an actual identity. The individuals who make the retail purchases using the gift cards are paid a small sum of money, often for each device that they turn over to the organizer(s) of the scheme.

17.     On December 28, 2023, the Concord, NH Police Department received a complaint from a resident in Alabama who reported that a gift card he purchased in Alabama was subsequently used at a Concord, NH Walmart without his permission. The Concord Police Department began working with Walmart's loss prevention unit. Walmart identified Mingdong CHEN (hereinafter "M. CHEN") as the person who used the Alabama gift card.  Walmart also identified a vehicle involved in this incident, a white Mercedes sedan with New York license plate KZH8797, registered to M. CHEN.

18.     On December 29, 2023, Concord police officers observed M. CHEN and his white Mercedes in the parking lot of the Concord, NH Walmart. M. CHEN was temporarily detained. Officers observed Apple iPads in their original packaging in the rear seat of the vehicle. The iPads were in plastic shopping bags, one of which was clearly distinguishable as a Target bag due to the red "bullseye" logo on it. M. CHEN's vehicle and cell phone were seized pending an application for a search warrant. M. CHEN was informed that he was free to leave in

Mandarin Chinese via Google translate as M. CHEN had a difficult time communicating in English. Once M. CHEN was advised that he was free to leave, a detective used Google translate to ask if he would be willing to speak with him. M. CHEN agreed to speak that evening at the Concord Police Department.

19.     M. CHEN was brought into an interview room where a recorded consensual interview was conducted. A Mandarin Chinese interpreter was available over the telephone.  The interpreter was present for the entirety of the recorded interview.  It was made clear to M. CHEN that he was not in custody, under no obligation to speak to law enforcement or answer any questions, and was free to leave at any time that he wished. M. CHEN was told that if he wanted to leave, a detective would immediately escort him back to the lobby. M. CHEN chose to voluntarily speak.

20.     M. CHEN claimed to have been to New Hampshire approximately five times previously and that he comes to New Hampshire from New York to purchase merchandise with gift cards because there is no sales tax. Additionally, purchasing merchandise with the gift cards was his only form of employment. M. CHEN stated that when he comes to New Hampshire to make the purchases, he stays for about three days at a time and sleeps inside of his vehicle at night. M. CHEN stated that he used to work with another person when he made the trips to New Hampshire, but that he now operates alone.

21.     M. CHEN stated that he receives a list of gift card numbers from his boss, later identified as Mengying JIANG (hereinafter "JIANG"), and uses them to make purchases of iPads, Apple Air Pods, Apple Watches, and ink cartridges for printers. Furthermore, he said the gift cards he uses to purchase merchandise belong to his boss and that he did not know his boss's name because he only communicates with him through the Chinese phone messaging application

WeChat. M. CHEN stated that he is paid $10.00 per device he purchases. M. CHEN acknowledged that he believed that the gift cards he was using were likely stolen. Specifically, M. CHEN mentioned seeing news stories explaining this type of scam.

22.     M. CHEN claimed that once the merchandise was purchased, it either goes back to New York or gets sent to China. M. CHEN stated that he returns to New York with the merchandise he purchased with gift cards, boxes it up, and leaves it outside of a warehouse/office building.  Once those items are collected and counted, he is instructed to return the following day to be paid in cash. M. CHEN was unable to recall the location of the merchandise drop point off the top of his head but said that the locations would be contained somewhere on his cell phone along with gift card information and communications with his boss and photographs of merchandise.

23.     Following the conclusion of the interview, M. CHEN was informed he was free to leave but he replied he had nowhere to go. An officer then obtained documentation indicating that M. CHEN had made several purchases at Walmart locations in Merrimack County earlier in that afternoon using several suspected fraudulent Walmart gift cards. At this point, M. CHEN was arrested.

24.     On January 3, 2024, Concord Police Officers searched M. CHEN's Mercedes pursuant to a New Hampshire state search warrant. They discovered approximately $20,000 (estimated retail value) in electronics and other retail items inside of the vehicle. These items included large quantities of Apple iPads, Apple Watches, ink cartridges, gaming console items, and a large bundle of Walmart, Target, and Best Buy gift cards. Most of the merchandise was still in shopping bags belonging to their respective retail stores. Most of these bags also contained receipts documenting the purchase of the items. The receipts indicated that many of

the purchases were made using multiple gift cards.

25.    On January 2, 2024, Concord Police Officers searched M. CHEN's cell phone pursuant to a New Hampshire state search warrant. Officers discovered that M. CHEN relied heavily on WeChat to send text messages, photographs, and videos. Many of the messages contained within M. CHEN's cell phone were related to retail gift cards and purchasing electronics. The messages contained gift card numbers, PIN numbers, and often a monetary value of the remaining balance on each card. The phone also contained photographs of electronic gift cards. It appeared M. CHEN would enter the gift card number and PIN code sent via WeChat into either the Walmart or Target application to make in-store purchases.

26.    Within the "Deleted Photos" folder, a Concord Police Detective observed a photograph dated December 10, 2023. The photograph showed two cardboard boxes with shipping labels attached to them. The shipping labels were labeled: Joe Jiang ███████ Nashua, NH 03060. There was also a video with a date stamp of December 11, 2023, which depicted a very large quantity of electronic devices in their original retail packaging stacked on the floor. The items varied but appeared to be iPads, Air Pods, and headphones. These items were consistent with the merchandise involved in the organized theft ring under investigation. There was also a WeChat message from M. CHEN that appeared to contain several gift card numbers along with the address of ███████████ Unit #312 in Nashua, NH (hereinafter "█ ███████████").

27.    On January 4, 2024, a New Hampshire court granted a warrant to search █ ███████████ Unit #312, which is a two-bedroom apartment. Law enforcement located two occupants inside, JIANG and Naxin WU (hereinafter "WU"). Officers found and seized numerous items. This included dozens of new iPhones in their original packaging, gift cards, a

counterfeit Washington State ID with JIANG's photo but a different name, approximately

$30,000 in U.S. currency, and notebook ledgers with pages of gift card information and

transactions from major retailers such as Walmart, Target, and Best Buy.

28.    During the execution of the search warrant, a delivery driver from UPS arrived at

the apartment with 15 packages subsequently discovered to contain 15 iPhones directly from

Apple. The UPS delivery driver advised that he makes approximately four deliveries to this

address each week, mostly consisting of Apple products. Numerous personal electronics

belonging to JIANG and WU were also found. This included a Lenovo laptop that had a program

containing hundreds of gift card numbers, PINs, and other values.  Thus, the laptop appeared to

be used to enter, receive, and/or track gift cards.  The search also uncovered various documents

with M. CHEN's name on it, including a Mercedes-Benz vehicle title and bank records.

29.    A subsequent New Hampshire state search warrant was obtained for the electronic

devices belonging to JIANG and WU.  The devices contained photos of large quantities of Apple

products in their original retail packaging, similar to the images uncovered on M. CHEN's phone

that led investigators to 18 Harbor Ave. Many devices included WeChat conversations that

exchanged hundreds of gift card numbers and PINs.  Also found were numerous Apple product

price sheets from different vendors that included specific prices for certain Apple products based

on the that particular day's pricing. The sheets included payment options, including PayPal,

cryptocurrency, wire transfers, and cash in certain U.S. cities, such as New York City,

Philadelphia, Los Angeles, and Miami.  Some instructions included notes to buy in small

amounts and provided shipping instructions, including minimum weight thresholds.  Other

findings included numerous documents with dozens of gift card numbers and balances within

each file. Other files included Hotmail email accounts showing order numbers and delivery

status.

30.     Additional photos found within these devices included images of large quantities of Apple products in an apparent industrial setting given the concrete floors and shipping boxes in the background. The dates of these photos were between August 2023 and September 2023. Also found was an image of a FedEx shipping label, dated September 15, 2023, from "██ ██████████Unit 2 Salem, NH 03079" (hereinafter "██████████████"). The sender was "Benson REN," and the addressee was "LOR SIU MING, HOWELL INTERNATIONAL TRADING LIMITED, ██████████████████████, KWUN TONG." This FedEx shipping label was located within a WeChat conversation that also included the dissemination of gift card numbers.

31.     One of JIANG's devices had "██████████" saved as a favorite location in Apple Maps. There was also a conversation between JIANG and another unknown individual in JIANG's WhatsApp messages, dated June 1, 2023, where JIANG stated that ██████████ ██ was a warehouse that could pack up merchandise to be shipped out. Additionally, there was an image of a partial shipping label, dated December 4, 2023, addressed to the name "Jack Jin" at 50A Northwestern Drive from A.I., 102 Goodman Drive, Carlisle, PA 17013.  I know from this investigation that 102 Goodman Drive, Carlisle, PA is a shipping address for Apple.

32.     On January 9, 2024, the Concord Police Department and HSI executed a New Hampshire state search warrant at 50A Northwestern Drive. Upon entry investigators encountered seven individuals working inside, including the owner of the business and renter of the warehouse unit, Jinbin Ren (DOB: ██/1987, MA DL S84537052) who resides at █ ██████████, Lynnfield, MA (hereinafter "REN").

33.     REN was detained in handcuffs on the second floor of the warehouse with other

12

individuals. From speaking with REN, officers believed he was able to understand and speak English. REN then agreed to speak with officers in private. However, because REN then claimed to not speak English, Concord Police had a Mandarin interpreter made available over the telephone. REN was brought into a private room and had his handcuffs removed. REN was read his Miranda rights and orally waived his rights; however, he did not wish to sign the Miranda waiver form. Additionally, while REN was willing to be interviewed, he did not want the interview to be recorded. The interpreter was present for the entirety of the non-recorded interview.

34.     REN acknowledged that the business belonged to him, and that he was the head of operations. REN stated that he owns a shipping company where his "clients" have their items shipped to him, and he then forwards the items to China. REN stated that he operates specifically in New Hampshire because there is no sales tax. REN stated that he keeps records from his customers in WeChat and that he was unaware of the origin of the items he was shipping. REN said that he did not ask any questions about what was being shipped and that he was paid via cash or had money sent to a Chinese bank account for his services. After further discussion, REN indicated that he suspected he may be assisting individuals involved in illegal activity. When asked if he was aware of any of the common gift card scams that have been going around, REN acknowledged that he was aware of them. However, REN has never asked his clients where they get their merchandise from.

35.     An ensuing search of the premises uncovered thousands of iPhones, hundreds of iPads, and many other electronic devices to include printers, copiers, streaming devices, computers, computer processors, gaming consoles, and headphones. In total, there were over 7,000 separate electronic items in their original packaging seized. Law enforcement also seized

13

approximately $10,000 in U.S. currency.  Also found and seized were a large quantity of retailer merchandise cards and gift cards. Thousands of empty shipping boxes were also found.  Most of these shipping boxes contained labels sent from A.I., 102 Goodman Drive, Carlisle, PA 17013, which is Apple. The nominal recipients were largely all different persons, with some clearly being fictitious persons, such as "Chicken" and "Tree" listed as the first names.

36.    A subsequent New Hampshire state search warrant was obtained authorizing the search of REN's personal electronics seized from the warehouse.  The devices contained numerous WeChat conversations pertaining to the exchange of gift card numbers and the shipment of Apple products. Specifically, a WeChat conversation with identifier wxid_ay4n90g4376g11 was located with the thread saved as "NH WM2." This identifier was previously found to belong to JIANG following a review of his devices and the chat title is believed to refer to an unknown Walmart in New Hampshire. The chat thread shared gift card numbers between JIANG and REN and discussed shipments.

37.    Research into additional blocks of gift card numbers that REN was distributing through WeChat revealed that most were linked to attempted online purchases.  Most cards were used over a dozen times to make online purchases. The Walmart payment system ultimately prevented the transactions from being processed. After the failed online transactions, unknown persons attempted to use the cards during in-store transactions.  Notably, the cards were all purchased in different parts of the country, with none of them originating in New Hampshire. Several cards were originally purchased in Arkansas, Texas, Tennessee, and California.

38.    Research into Walmart gift card numbers sent by REN to JIANG through WeChat led to additional discoveries.  Walmart confirmed that many of the cards were used in New Hampshire stores. Walmart video surveillance pertaining to these gift card purchases show WU

14

and JIANG buying Apple products at checkout. Other gift cards contained in these messages were purchased in other regions of the U.S. and used in New Hampshire, sometimes in as little as 24 hours after purchase.  Other cards were previously frozen by Walmart after being reported as lost or stolen.

39.    Following the ████████████████ search, REN, JIANG, and WU were arrested on New Hampshire state arrest warrants. All three currently remain incarcerated. JIANG and WU were arrested at JFK International Airport as they attempted to leave the U.S. for China on March 2, 2024.  REN left the U.S. for China approximately four days after the ████ ████████████ search but was arrested at Logan International Airport upon his return on May 24, 2024.  He was wearing a neck brace.  An image obtained from JIANG's phone that was searched pursuant to a federal search warrant revealed a photograph of REN in a hospital bed with a tube attached to his inner neck.  It is suspected that REN was assaulted in China due to the seizure of millions of dollars' worth of Apple products at his warehouse.

40.    As the investigation continued, law enforcement developed leads on additional New Hampshire addresses and warehouses that were receiving high volumes of suspicious Apple products.  This activity was nearly identical to the conduct performed by M. CHEN, REN, JIANG, and WU.  As set forth in more detail below, these locations were found to be associated with REN, JIANG, and WU through phone toll records. These addresses include SUBJECT PREMISES 1, 2, 3, 4 and 5.  Through subpoenas, surveillance, and other investigative means, it was determined that these five SUBJECT PREMISES received and continue to receive large quantities of Apple products, many of which were purchased with gift cards.

41.    According to Apple, SUBJECT PREMISES 1 received 38,282 Apple electronics in an approximately four-month span from March 2024 to July 2024.  The transaction value of

these products exceeds $41 million.  These purchases were made using 27,458 different Apple IDs, 26,677 different email addresses, and 7,479 different phone numbers. They were also made using 892,954 gift cards with over $69 million in gift card value loaded onto them.  Of those gift cards, 860,480 were loaded in China.  Many of these Apple IDs, emails, and phone numbers are linked to identical suspected fraud schemes in other states without sales tax, including Delaware and Oregon.

42.    A subpoena served to Erkat LLC, the owner and landlord of SUBJECT PREMISES 1, showed the operative lease agreement for SUBJECT PREMISES 1 was made beginning in March 2024 and lists MSZ Express Inc. and Jian LIN (hereinafter "J. LIN" or "Harley") as the lessees. A subject by the name of Jianxu REN (hereinafter "J. REN") signed the lease as the authorized signer for MSZ Express Inc.  The "Guaranty" section calls for J. REN to jointly and severally guarantee the lease, but underneath that section J. LIN and not J. REN signed.  Public business records obtained from the New Hampshire Secretary of State only list J. LIN and another unknown individual as being the registered agents of MSZ Express Inc., not J. REN.  Additional records from the New Hampshire Secretary of State show a business, CPS Express Inc., as registered at SUBJECT PREMISES 1. J. LIN is the only registered agent listed on this business filing.

43.    The rental records reveal that most of the monthly rent payments of approximately $2,625 are paid in cash. A photograph of a text conversation between the landlord of SUBJECT PREMISES 1 and J. LIN was also provided by the landlord and showed a receipt for $1,000.  The text underneath the photograph stated, "Harley's cash."

44.    A review of phone toll records links both REN and JIANG from the aforementioned conspiracy to J. LIN and J. REN. J. LIN's phone number of (212) 518-8390 was

identified as a contact of REN and JIANG. The number was confirmed to be J. LIN's through subpoenaed subscriber information from the phone provider. J. REN's phone number was also a contact of REN and JIANG and confirmed to be J. REN's through law enforcement databases.

45.     Specifically, analysis revealed approximately 125 phone calls/texts were made between REN and J. LIN between February 2023 and May 2024. Additionally, approximately 30 calls/texts were made between JIANG and J. REN from September 2023 and November 2023. There were approximately 581 phone calls/texts between J. REN and J. LIN between December 2023 and August 2024. J. LIN also had approximately 288 calls/texts with a Jiangh HE, who was a consignee on shipping box labels from Apple found in REN's warehouse search warrant. Those labels also listed Jiangh HE's phone number.

46.     On September 5, 2024, a victim residing in Rancho Cordova, CA, contacted the Jaffrey, NH police department and reported someone was using his Apple ID to make fraudulent purchases online. The alleged fraudster purchased two iPhones, one for $1,199 and the other for $999. Both were shipped to SUBJECT PREMISES 1. The fraudster combined the victim's Apple ID and phone number with other peoples' shipping and billing addresses and credit card information. Specifically, there were two web orders placed on August 29, 2024, for one iPhone each. The victim filed a report with his local police department, but let Jaffrey PD know about SUBJECT PREMISES 1 since the delivery address was only link between the two orders.

47.     Subpoenaed Apple records for SUBJECT PREMISES 3 also show large volumes of electronics being sent there. From March 2020 to January 2024, 7,049 new Apple products were sent to SUBJECT PREMISES 3, totaling $9,471,253. These purchases were made using 5,784 different Apple IDs, 4,409 different email addresses, and 1,602 different phone numbers. Over $10 million in gift card value was loaded into the Apple ID accounts associated with these

17

purchases.  The purchases were made using over 80,000 gift cards, of which 69,795 were loaded in China.

48.    I spoke with the Troy, NH Chief of Police in September 2024 and learned that numerous victims from across the United States called the Troy Police reporting fraudulent purchases made with stolen gift card information.  Those purchases were then shipped to SUBJECT PREMISES 3 using fake names.  One victim in particular purchased a $500 American Express gift card on November 29, 2023, from a CVS Pharmacy in Opelousas, LA.  When trying to activate the card just hours later, he found it had a balance of only $1.  He later discovered a $499 purchase was made from Apple for an iPhone 15 Pro (Serial #M46T67F04X) using that gift card.  The receipt for the purchase displayed the name SZ James, which is not the victim's name, and an address of SUBJECT PREMISES 3. When reviewing the UPS tracking information that was contained in the order, the victim noted that it was delivered to SUBJECT PREMISES 3 on November 30, 2023, and received by "Jian Lin" (J. LIN). On December 8, 2023, the Troy, NH police department spoke with J. LIN about this package.  J. LIN later found the phone and turned it over to the Chief of Police. The Chief of Police knows from prior interactions with J. LIN that he goes by the name of "Harley."

49.    Additionally, on June 23, 2023, the Keene, NH Police Department received a call from the Walmart Loss Prevention in Keene, NH to report a suspect had arrived to pick up electronic devices which were web-ordered with credit cards. Some of these items were fraudulently purchased using compromised credit cards. On this same date, the Keene Police Department stopped the suspect's vehicle and identified the driver as J. LIN. He explained that he picks up items for his friend "Tony Chan" from Connecticut.  J. LIN stated he doesn't get paid but his friend sends these items to China and is seemingly trying to save money by buying

products from New Hampshire, where there is no sales tax. J. LIN stated he was supposed to pick up more items, but Walmart would only give him the four items he had. The officer told J. LIN that the items were all purchased with stolen credit cards.

50.    SUBJECT PREMISES 3 is immediately adjacent to a U.S. Post Office (USPS). Postal personnel indicated that J. LIN has a PO Box in his name at that post office.  In J. LIN's application for that PO Box, he identified his address as ███████████, Unit 6 and 7, Troy, NH.  Again, ███████████, Unit 6 in Troy, NH is SUBJECT PREMISES 3.  The Troy, NH Police Chief was also aware that J. LIN controlled both Units 6 and 7, which again are immediately adjacent to one another.  Surveillance conducted on SUBJECT PREMISES 3 on November 12, 2024, shows a number "6" on the front glass door immediately to the left of the post office.  Unit 7 is not marked but has an identical front glass door immediately adjacent to Unit 6.  Both Units 6 and 7 have identical blinds and/or drapes covering all door and windows.

51.    A USPS employee who was previously inside of SUBJECT PREMISES 3 told law enforcement on November 12, 2024, that she has seen a computer onsite.

52.    Subpoenaed Apple records for SUBJECT PREMISES 2 reveal 4,158 Apple purchases from January 2024 to May 2024, reflecting a $4,921,175 transaction value, were sent to that address. These purchases were made using 2,991 Apple ID accounts, 2,989 different email addresses, and 1,295 different phone numbers.  The purchases were made using 139,768 gift cards, which had over $4.5 million in value loaded. Of these gift cards, 118,713 were loaded from China.

53.    On September 11, 2024, law enforcement initiated surveillance at SUBJECT PREMISES 1.  Upon arriving at approximately 10:00 am, I observed the bay door to SUBJECT PREMISES 1 open and two Asian males sitting at a table. One was wearing a yellow t-shirt and

blue jeans and the other was wearing a long-sleeve gray shirt and black Nike shorts with flip-flops. I saw numerous cardboard boxes inside SUBJECT PREMISES 1, including some heavily wrapped with shipping tape. I also saw TARGET VEHICLE 1 parked approximately 20 yards in front of Unit 3, next to a dumpster.  TARGET VEHICLE 1 is registered to Dandan LIN (DOB: ██/1994) of ███████████, Flushing, NY 11367.

54.    At approximately 10:50 am, I observed a FedEx van pull up to SUBJECT PREMISES 1 and begin making deliveries. The two Asian males previously observed assisted the FedEx driver with carrying the packages from the van to the warehouse.  The packages were small cardboard boxes contained inside of several large clear trash bags.  Once the packages were inside the warehouse, they were dumped out of the bags and onto the floor.  UPS arrived minutes later but departed without making any deliveries shortly afterwards.  Once the UPS truck departed, a third Asian male appeared from SUBJECT PREMISES 1. This subject was wearing a black sweatshirt with a hood and dark blue jeans with flip-flops.

55.    Once FedEx departed minutes later, all three males placed the packages on a table against the wall inside the unit, stacked, and sorted them.  At approximately 11:08 am, the subject wearing a black sweatshirt and jeans could be seen using what appeared to be a cell phone, looking down at it and manipulating the phone with both hands.  This lasted for several seconds.

56.    At approximately 11:10 am, a white Penske truck arrived and began offloading small cardboard packages onto a cart provided by one of the subjects.  The driver of the truck was wearing plain civilian clothes.  This delivery was minimal as there were no more than approximately 10 packages delivered.

57.    Approximately two minutes later, the Penske truck departed and a large UPS

20

truck backed up to SUBJECT PREMISES 1. The UPS driver, with the assistance of all three subjects, unloaded the packages from the truck.  UPS was there for approximately 15 minutes and then departed. All three subjects continued to place boxes on the table and stack them into piles.

58.     At approximately 11:40 am, the subject with the Nike shorts, who was now wearing a dark colored t-shirt, wheeled out several large mail carrier bins full of empty cardboard boxes and emptied them into the dumpster.  The subject in the yellow t-shirt ran out several moments later to assist due to the number of cardboard boxes.  This same subject was then observed in the dumpster, stomping the boxes down to make more room.  Both subjects then returned to the unit with empty mail bins.  The garage bay door partially closed shortly after this, leaving the door open only about three feet from the ground.  Only the subjects' legs could be observed moving around in the unit at this time.  I then observed all the windows on the bay door, including the window of the walk-in door, covered from the inside by what appeared to be cardboard, obstructing any view into the unit from the outside.

59.     At approximately 12:05 pm, TARGET VEHICLE 2 pulled up to SUBJECT PREMISES 1.  This van was driven by an Asian male wearing a white t-shirt and light-colored pants. This van is registered to J. LIN at ███████████, Troy, NH.  J. LIN lives at 5 Woodland Park, Troy, NH.  The driver exited TARGET VEHICLE 2 and entered SUBJECT PREMISES 1 via the walk-through door on the left. Minutes later, the subject with the Nike shorts and dark t-shirt wheeled out four more mail bins full of empty cardboard boxes and disposed of them in the dumpster. Due to the number of boxes, the dumpster was overflowing and the subject used his feet to push and flatten the boxes.

60.     At approximately 12:14 pm, the driver of TARGET VEHICLE 2 walked out

carrying approximately three cardboard boxes stacked on top of each other.  He placed the boxes into the back of TARGET VEHICLE 2. TARGET VEHICLE 2 then departed moments later with the same subject in the white t-shirt driving.  Inside the unit, a large quantity of small white boxes were stacked together. These appeared to be iPhones and other Apple electronics. The bay door then partially closed again as the subject in the Nike shorts and dark t-shirt exited and made his way over to TARGET VEHICLE 1.  This subject appeared to be trying to open the trunk of TARGET VEHICLE 1 with a key fob but was having trouble doing so.

61.    I followed TARGET VEHICLE 2 to SUBJECT PREMISES 3. TARGET VEHICLE 2 parked behind the units located at ███████████, Troy, NH.  A FedEx truck was parked a few feet in front of the van, unloading packages into SUBJECT PREMISES 3 through a door .  SUBJECT PREMISES 3 is in between an out-of-business Chinese restaurant and the post office. I later observed SUBJECT PREMISES 3 had cloth sheets covering all the front windows and doors so that no one can see inside.

62.    I later returned to SUBJECT PREMISES 1 and observed the bay door was partially closed.  However, I could see the legs of subjects moving around inside.  TARGET VEHICLE 1 was still parked in the same location. At approximately 2:10 pm, I observed a subject exit the unit, enter TARGET VEHICLE 1, and back it up to Unit 3.  The vehicle was there for several minutes as three subjects loaded the vehicle with boxes.  At approximately 2:16 pm, three subjects entered TARGET VEHICLE 1 and drove off. TARGET VEHICLE 1 turned left onto Prescott Road and proceeded north. I followed the vehicle for several minutes but ultimately could not relocate the vehicle due to traffic at a stop sign.  I later returned to SUBJECT PREMISES 1.  TARGET VEHICLE 1 was not seen again for the remainder of the surveillance.

63.     I later approached the dumpster and saw it was full of small cardboard boxes.  I recognized these boxes as Apple shipping boxes from prior investigative steps.  The return addresses were also all from A.I., 102 Goodman Drive, Carlisle, PA 17013, which is Apple.  Due to the hundreds of empty boxes that were in the dumpster, I took photos of a random sample of these boxes. Recipient names of the ones photographed were Marcia Wendy, Bingdao Qitian, Shisan Qitian (three times), Bingdao Qitian, Shisan Qitian, Da Fa, and Philip Louis Nowa.  I also observed a sign taped to the door stating: "TO UPS FEDEX AND USPS CALL 2125188390 HARLEY IF NO ONE INSIDE THANK YOU."

64.     The phone number (212) 518-8390 was listed as J. LIN's phone number on documents from TD Bank for an account held in the name of MSZ Express Inc., with an address of ███████████, Troy, NH.

65.     According to a law enforcement database, the phone number (212) 518-8390 is a cell phone.

66.     On September 13, 2024,  IRS-CI Special Agent Daniel Fornash and I initiated surveillance at SUBJECT PREMISES 1. Upon arriving at the warehouse, three Asian males were observed inside SUBJECT PREMISES 1, which were the same three males observed during the September 11, 2024 surveillance. At approximately 10:55 am, a white Penske truck delivered a small number of packages to the unit. The Penske truck departed minutes later. At approximately 11:20 am, a large UPS truck arrived and delivered an unknown amount of packages. The UPS truck departed at approximately 11:26 am, at which time a subject wearing a brown t-shirt with "1977" on the front closed the bay door, leaving it partially open at the bottom by several feet.

67.     At approximately 11:50 am, TARGET VEHICLE 1 departed the unit. Due to

positioning, agents were unable to see which occupants entered the car. TARGET VEHICLE 1 was followed to the Shell gas station located at 116 NH-119, Rindge, NH 03461. At this time, all three subjects previously observed at the warehouse exited the vehicle. Once the vehicle was fueled, it departed and headed east on Route 119.

68.     Agents followed TARGET VEHICLE 1 to the One Beachmont apartment complex located at ███████████████████ in Revere, MA 02151. These apartments are advertised as luxury apartment units according to the company's website. All three subjects were observed exiting TARGET VEHICLE 1 and entering the building through the front door at approximately 1:40 pm. It is unknown at this time which unit they went to.

69.     I entered the building shortly after and initiated surveillance in the lobby near the elevators. At approximately 1:52 pm, a subject previously observed at SUBJECT PREMISES 1 wearing a tan t-shirt, blue jeans, and sandals was seen entering the front lobby doors with a large cardboard box that was heavily wrapped in shipping tape. This subject placed the box on a luggage cart that was in the lobby. Due to the way the subject carried the box, it appeared to be heavy.

70.     The subject then wheeled the cart with the box on it to the elevator bank and entered an elevator moments later by himself. I saw from the elevator floor locator screen that the elevator went to the sixth floor, which is the top floor of the building. I took another elevator to this floor shortly after but was unable to locate the subject. I returned to the lobby after walking around the sixth floor.

71.     At approximately 2:14 pm, I observed the subject in the black t-shirt that was previously seen at SUBJECT PREMISES 1 exit the elevator while wheeling out an empty luggage cart and placing it back by the main lobby doors. This subject then exited the building

24

and returned to TARGET VEHICLE 1 where Agent Fornash observed him get in the driver's seat. He remained there for some time before driving off in TARGET VEHICLE 1. Both agents attempted to catch up to TARGET VEHICLE 1, which was last seen heading south on Route 1A in Revere. Surveillance terminated at this time.

72. A subsequent review of phone toll records in this case, along with other law enforcement databases, link J. LIN to a Jianxiong REN (DOB: ███/1998) (hereinafter JX REN) who resides at ███████████████████████, Apt. 613, Revere, MA. A floor map of this apartment building shows Apartment 613 is on the sixth floor. Toll records indicate that approximately 56 phone calls/texts were made between J. LIN (again, using the number (212) 518-8390) and JX REN from June 6, 2024 to September 10, 2024. Subpoenaed subscriber records confirmed JX REN's phone number. Additional research revealed JX REN is the brother of J. REN. JX REN and J. REN are both registered agents of a Florida company called NIUB Technology, according to Florida Secretary of State public records.

73. On September 17, 2024, I surveilled SUBJECT PREMISES 2. Upon arriving at approximately 10:00 am, I observed TARGET VEHICLE 1 parked in front of SUBJECT PREMISES 2. Two Asian males were observed sitting in TARGET VEHICLE 1, with the driver hanging his foot out the window. The bay door to SUBJECT PREMISES 2 was partially open at the bottom and all windows to the unit had cardboard covering them from the inside, restricting any view inside the unit.

74. At approximately 10:23 am, a large UPS truck backed up to the bay door of SUBJECT PREMISES 2, which was now open. Both subjects from TARGET VEHICLE 1 were now inside SUBJECT PREMISES 2 and assisting the UPS driver with offloading packages. At approximately 10:49 am, the UPS truck departed and the garage bay door was immediately

lowered. However, the door was left partially open at the bottom, leaving approximately one foot of open space.  An Asian male wearing a white t-shirt, light colored pants, and sandals then exited the unit through the walk-through door, entered the driver's seat of TARGET VEHICLE 1, and rolled up the window.  He returned to the unit again through the walk-through door moments later.

75.    At approximately 12:15 pm, I observed the subject in the white t-shirt exit SUBJECT PREMISES 2, enter TARGET VEHICLE 1, and back it up to the bay door. He then opened the trunk and entered the unit again.  Seconds later, he and the subject in the black t-shirt began loading heavily taped cardboard boxes into the vehicle. There were 9 boxes total. Based on the manner they were carrying the boxes, it appeared that all boxes were heavy.

76.    The subject in the white t-shirt then departed by himself in TARGET VEHICLE 1 and I followed him to SUBJECT PREMISES 1.  TARGET VEHICLE 1 arrived at approximately 12:52 pm and backed directly into SUBJECT PREMISES 1.  Another Asian male who was already in the unit helped the subject in the white t-shirt unload the boxes from TARGET VEHICLE 1 into SUBJECT PREMISES 1.  This other subject was wearing a black t-shirt with a large white square logo on the front.  Once the boxes were unloaded, the white t-shirt subject then moved TARGET VEHICLE 1 out of the unit and parked close by.  The garage bay door was later lowered, leaving it partially open at the bottom.

77.    At approximately 4:15 pm, a FedEx van pulled up to SUBJECT PREMISES 1. Both subjects wheeled out a dolly with 10 cardboard boxes that were heavily taped.  The subject in the black t-shirt with the white logo entered the FedEx van from the rear doors and began putting the boxes inside of the van for the FedEx driver, who was standing next to the subject in the white t-shirt by the dolly. The white t-shirt subject handed the black t-shirt subject the boxes.

26

Given how the subjects were handling the boxes, it appeared the boxes were very heavy.  The FedEx van departed shortly after and I followed it.

78.     The FedEx van entered another business several miles down the road and parked at a loading dock.  I approached the driver.  The driver agreed to speak with me.  When questioned about SUBJECT PREMISES 1, the driver said he was familiar with that unit and the subjects.  He stated they are all very nice and are always receiving packages of iPhones. The driver was also aware of other locations receiving high-volume shipments of Apple products, including SUBJECT PREMISES 2.  The driver let me look at the boxes he picked up from SUBJECT PREMISES 1.  Upon entering the FedEx van, I observed 10 heavily taped boxes stacked against the side wall. All the boxes had the same sender and receiver info on the shipping labels:

79.     Sender: Steven ZHANG; ██████-1506; ██████████████, Quincy, MA 02169

80.     Receiver: Union Logistics Miami; ██████-1506; 7931██████████ Miami, FL 33166

81.     Both the receiver and sender phone numbers are the same. The FedEx driver stated that these boxes were going directly to the FedEx facility in Londonderry, NH, next to the Manchester airport, and would be on a plane by that evening. I returned to SUBJECT PREMISES 1 and TARGET VEHICLE 1 was no longer there.  Surveillance was terminated at this time.

82.     On October 16, 2024, I observed via video surveillance TARGET VEHICLE 3 park directly in front of SUBJECT PREMISES 1. Two Asian males exited TARGET VEHICLE 3 and entered SUBJECT PREMISES 1 through the front walk-through door. The bay door was

then opened moments later while an Asian male exited SUBJECT PREMISES 1, opened the trunk of TARGET VEHICLE 3, and removed items from the trunk.  The Asian male brought the items into SUBJECT PREMISES 1 in separate trips.  This same subject then closed the trunk and parked TARGET VEHICLE 3 in a nearby parking spot.  At this time, TARGET VEHICLE 2 could be seen parked inside of SUBJECT PREMISES 1. Approximately 45 minutes later, a FedEx van reverse parked into SUBJECT PREMISES 1 where several items were loaded into the back of the van.  FedEx departed minutes later.

83.    On October 17, 2024, at approximately 8:15 am, two Asian males were observed via video surveillance exiting SUBJECT PREMISES 1 within one minute of each other.  The first male was wearing a dark long-sleeve shirt, dark pants, and white sneakers.  The second male was wearing a white long-sleeve shirt and dark pants.  Both subjects entered TARGET VEHICLE 3 and drove away.  At approximately 8:45 am, TARGET VEHICLE 3 was observed via video surveillance arriving at SUBJECT PREMISES 2. The same two Asian males exited TARGET VEHICLE 3 and entered SUBJECT PREMISES 2, at which point the large bay door was opened. Within minutes, they wheeled out three large mail bins full of small cardboard boxes which I recognize from this investigation to be Apple iPhone shipping boxes.

84.    At approximately 9:23 am, a large UPS truck backed up to the left garage bay door of SUBJECT PREMISES 2. The UPS truck departed at approximately 9:37 am and the bay door was closed moments later, leaving it open approximately one foot from the ground. At approximately 10:01 am, a FedEx van arrived at SUBJECT PREMISES 2.  The bay door was opened. The Asian male wearing the long-sleeve white shirt exited SUBJECT PREMISES 2 with a large mail bin and brought it over to the FedEx van. At approximately 10:07 am, both Asian males carried the large mail bin into SUBJECT PREMISES 2. The bin appeared to be heavy.

The FedEx van then departed and the garage door was again lowered minutes later, leaving the door open approximately two feet from the ground. At approximately 3:23 pm, the male wearing the dark long-sleeve shirt and pants exited SUBJECT PREMISES 2, entered TARGET VEHICLE 3, backed up to the garage door of SUBJECT PREMISES 2, and opened TARGET VEHICLE 3's trunk door. Six large cardboard boxes were placed into TARGET VEHICLE 3. Both subjects then departed in TARGET VEHICLE 3 minutes later.

85.     At approximately 3:54 pm that same day, I observed via video surveillance the garage door at SUBJECT PREMISES 1 open and TARGET VEHICLE 2 exit the unit. TARGET VEHICLE 2 appeared to park nearby, just out of view of the camera.  At approximately 3:59 pm, TARGET VEHICLE 3 pulled up to SUBJECT PREMISES 1. The Asian male previously wearing the white long-sleeve shirt but now wearing a black t-shirt and same dark-colored pants exited TARGET VEHICLE 3, entered SUBJECT PREMISES 1, and opened the bay door. TARGET VEHICLE 3 then backed into SUBJECT PREMISES 1 and opened the trunk. The two Asian males in TARGET VEHICLE 3 that were previously at SUBJECT PREMISES 2 unloaded the boxes from TARGET VEHICLE 3. Minutes later, TARGET VEHICLE 3 exited SUBJECT PREMISES 1 and parked nearby.  The subject wearing the dark long-sleeve shirt exited TARGET VEHICLE 3, walked towards where TARGET VEHICLE 2 was parked, and then entered SUBJECT PREMISES 1 again. At approximately 4:53 pm, a FedEx van pulled up to SUBJECT PREMISES 1 and backed halfway into the unit. The rear door was opened and items were loaded into the van.

86.     On October 8, 2024, this Court granted tracker warrants for TARGET VEHICLES 1 and 2.  *See* Case Nos. 24-mj-261-01-TSM and 24-mj-262-01-TSM. The tracker was placed on TARGET VEHICLE 1 on October 23, 2024.

29

87.    On October 30, 2024, this Court granted tracker warrants for TARGET VEHICLES 2 and 3. *See* Case Nos. 24-mj-283-01-TSM and 24-mj-284-01-TSM. The tracker was placed on TARGET VEHICLES 2 and 3 on October 30, 2024. GPS trackers are known to be accurate within approximately a half-meter but this can depend on interference, such as buildings or other physical structures.

88.    Based on additional surveillance and information obtained from the tracker data, this same pattern of activity involving TARGET VEHICLES 1, 2, and 3 moving between the SUBJECT PREMISES was observed several additional times between October 23, 2024 and November 9, 2024.  Both TARGET VEHICLES 1 and 3 were seen on the tracker going to SUBJECT PREMISES 1 and 2 multiple times a day.  TARGET VEHICLE 1 was at the Revere, Massachusetts address on three separate dates (October 23, November 2, and November 9, 2024), and TARGET VEHICLE 3 was at the Revere address on November 9, 2024.  Between October 20, 2024 and November 8, 2024, TARGET VEHICLE 2 was seen on the tracker going back and forth between SUBJECT PREMISES 1 and 3 approximately eight times and was only seen once at SUBJECT PREMISES 2.  TARGET VEHICLES 1 and 3 were in the Flushing, New York area from late in the day on November 2 to midday November 4, 2024.  TARGET VEHICLE 2 was in the Flushing, New York area late in the day November 3 to late in the day November 4, 2024. On October 31, 2024, November 1, 2024, and November 5, 2024, all three TARGET VEHICLES were at SUBJECT PREMISES 1 at the same time. TARGET VEHICLE 2 was the only vehicle seen at SUBJECT PREMISES 3 and was there every day from October 30, 2024 to November 9, 2024.

89.    Additional information obtained from the tracker data, as well as information obtained from UPS, link the conspiracy to SUBJECT PREMISES 4 and 5. UPS identified that J.

REN, JX REN, and J. LIN/"Harley" are tied to SUBJECT PREMISES 4 and 5.  Specifically, J. REN, JX REN, and J. LIN/"Harley" recently expanded their operations to SUBJECT PREMISES 4 and 5.  SUBJECT PREMISES 4 and 5 were new delivery locations as of late October/early November this year.

90.    On October 31, 2024, November 1, 2024, November 5, 2024, and November 8, 2024, all three TARGET VEHICLES were at SUBJECT PREMISES 4 at the same time.  According to tracker data, TARGET VEHICLE 1 was nearby[1] SUBJECT PREMISES 4 a total of approximately 276 times from October 23, 2024 to November 1, 2024 and November 5, 2024 to November 9, 2024; TARGET VEHICLE 2 was nearby SUBJECT PREMISES 4 a total of approximately 241 times from October 31, 2024 to November 1, 2024, November 4, 2024 to November 5, 2024 and again on November 8, 2024; and TARGET VEHICLE 3 was nearby SUBJECT PREMISES 4 a total of approximately 187 times from October 31, 2024 to November 2, 2024 and November 4, 2024 to November 8, 2024.

91.    Tracker data showed that TARGET VEHICLE 1 was nearby SUBJECT PREMISES 5 a total of approximately 20 times on October 23, 2024 and October 24, 2024.  TARGET VEHICLE 2 was nearby SUBJECT PREMISES 5 a total of approximately 46 times on October 31, 2024, November 4, 2024, November 5, 2024, and November 8, 2024.  Tracker data did not show TARGET VEHICLE 3 nearby SUBJECT PREMISES 5 in the last few weeks.

92.    Surveillance conducted on November 12, 2024 showed both UPS and FedEx deliveries being made to SUBJECT PREMISES 4. Upon arriving at this location, law

---

[1] In the context of the trackers, "nearby" means within 100 yards.

enforcement observed all windows in the front of SUBJECT PREMISES 4 had their blinds lowered, blocking any view of the inside. Surveillance and tracker data both showed TARGET VEHICLE 1 arriving at SUBJECT PREMISES 4 at approximately 9:21 am.  TARGET VEHICLE 2 arrived shortly after at approximately 10:16 am. Both TARGET VEHICLEs 1 and 2 parked directly in front of SUBJECT PREMISES 4. Once TARGET VEHICLE 2 arrived, both Asian male drivers entered SUBJECT PREMISES 4 through the front door. These two subjects were the sole occupants of TARGET VEHICLEs 1 and 2.

93.    At approximately 10:23 am, a Budget rental truck arrived and parked in front of SUBJECT PREMISES 4.  A driver wearing a brown UPS uniform exited and went to the back of the truck.  Both Asian males later exited SUBJECT PREMISES 4 via the front door and were wearing dark colored jackets or sweatshirts with a hood over their heads.  They met the UPS driver at the back of the truck and began offloading packages into large mail bins that the males later carried into the front door of SUBJECT PREMISES 4.  They made several trips from the truck to SUBJECT PREMISES 4 during this delivery.  The bins appeared to be heavy.  Surveillance conducted from the rear of the Budget truck indicated many of the packages were small and appeared similar to the iPhone shipping boxes witnessed throughout this investigation.  Many of these boxes also contained red and white labels that appeared similar to other shipping boxes of electronics, which indicate that they contain lithium batteries. UPS later departed at approximately 10:50 am, making it nearly a 30 minute delivery.

94.    At approximately 11:05 am, a FedEx van arrived at SUBJECT PREMISES 4. Both Asian males assisted the FedEx driver with carrying two large mail bins full of packages into the front door of SUBJECT PREMISES 4.  These bins also appeared to be heavy.  The packages in those bins could not be observed due to the positioning of the surveillance location.

FedEx departed at approximately 11:18 am. At approximately 11:39 am, a large brown UPS truck arrived at the front of SUBJECT PREMISES 4. The UPS driver then delivered one medium sized brown box to the front door of SUBJECT PREMISES 4. UPS departed moments later.

95.    Surveillance of SUBJECT PREMISES 5 was also conducted on November 12, 2024.  SUBJECT PREMISES 5 is in a multi-unit warehouse just minutes away from SUBJECT PREMISES 4.  A "CPS Air" sign with Chinese writing was found approximately halfway down the warehouse with an arrow pointing towards a door.  From public source searching it appears that CPS Air was a Chinese company.  Above this arrow was a sign stating "Unit B." This sign was posted to a portable walk-through car canopy with a metal roof and metal legs.  On the top of the entrance of the canopy was a sign that said "Shipping & Receiving." On the building door the canopy led to was a taped sign that read "TO UPS FEDEX PLEASE CONTACT NUMBER BELOW IF NOT AVAILABLE HARELY 2125188390."  It appears that he spelled "Harley" wrong.  This was substantially the same sign (including the same phone number) previously observed on the door of SUBJECT PREMISES 1.  The window next to the door was not obstructed and agents could see an empty room with several tables and two wheel carts with empty shelves.

96.    The property manager of SUBJECT PREMISES 5 was also located at this address and spoke to law enforcement.  He stated the property owner leases both SUBJECT PREMISES 4 and 5 to "Harley," who is usually with other Asian males.  He also stated that he was suspicious of their phone shipping activity and had made a complaint to the Rindge, NH Police Department about it.  He confirmed that SUBJECT PREMISES 5 is essentially empty and that packages are occasionally delivered here.  In regards to SUBJECT PREMISES 4, Harley only

leases the first floor and the front door is the only access point he and his acquaintances are able to use. This property manager, through the property owner, later provided the lease agreements of both SUBJECT PREMISES 4 and 5 to law enforcement. The SUBJECT PREMISES 4 lease is between the landlord and Goodwin Express LLC, a New Hampshire limited liability company with a mailing address of ███████████, Unit 3, Jaffrey NH 03452 (SUBJECT PREMISES 1). The lease is for approximately 1,200 square feet on the first floor of ████████████, Rindge, NH. The lease was signed by Jian Lin (J. LIN) and Jianxu Ren (J. REN) and copies of their drivers' licenses were included in the lease application documents. The SUBJECT PREMISES 5 lease for "Tenant B" is between the landlord and CPS Express LLC, a New Hampshire limited liability company with a mailing address of ███████████, Unit 3, Jaffrey NH 03452 (SUBJECT PREMISES 1). The lease is for approximately 2,000 square feet of space located at ████████████, Rindge, NH. The lease was signed by Jian Lin (J. LIN) and Jianxu Ren (J. REN) and copies of their drivers' licenses were included in the lease application documents.

97.    Records obtained from the owner of SUBJECT PREMISES 1 showed that J. REN and J. LIN ("Harley") communicated with the owner of SUBJECT PREMISES 1 by email. J. REN's email is jianxuren888@gmail.com.  It appears that J. LIN's email from those communications is dragonpalace007@yahoo.com.  Dragon Palace is the name of the now out-of-business restaurant next to SUBJECT PREMISES 3.

98.    Dragonpalace007@yahoo.com was the email address that J. LIN provided to Wonder Casino in Dover, New Hampshire, in connection with a March 2024 transaction.

99.    On November 14, 2024, Apple provided additional, more recent data about deliveries to the SUBJECT PREMISES.  Since approximately August 11, 2024 to November 13,

34

2024, information obtained from Apple revealed SUBJECTS PREMISES 1, 2, 4, and 5 have received approximately $28,000,000 worth of Apple products. Specifically, SUBJECT PREMISES 1 has received approximately 10,000 devices, totaling just under $10,000,000 in value. SUBJECT PREMISES 2 has received approximately 12,000 devices, totaling roughly $11,000,000 in value. SUBJECT PREMISES 4 has received approximately 6,000 devices, totaling just under $6,000,000 in value. Finally, SUBJECT PREMISES 5 has received approximately 2,300 devices, totaling just under $2,000,000 in value. It should be noted that SUBJECT PREMISES 4 and 5 have only been in operation since late October/early November of this year.  These purchases were made utilizing many different Apple ID accounts.

100.    Recent video surveillance of SUBJECT PREMISES 3 reveals ongoing deliveries to this address. Specifically, on November 6, 2024, at approximately 4:28 pm, law enforcement observed a UPS truck arrived at the back doors of SUBJECT PREMISES 3.  At approximately 4:30 PM, the UPS driver handed three boxes and two bags to an Asian male wearing glasses, a dark short sleeve shirt and black pants who was just inside the back double doors.  The UPS driver picked up four brown cardboard boxes from the ground inside the double doors of the SUBJECT PREMISES 3 and left in his UPS truck.

101.    On November 7, 2024, law enforcement observed via video surveillance, at approximately 4:26 pm, a UPS truck pull up to the back doors at SUBJECT PREMISES 3.  The UPS driver delivered two brown cardboard boxes and placed them on the ground inside of the double doors.  The UPS driver returned to the opened double doors, picked up boxes from the ground inside the double doors of SUBJECT PREMISES 3, and carried approximately seven different sized brown cardboard boxes back to his truck.

102.    On November 8, 2024, law enforcement observed via video surveillance, at

approximately 4:33 pm, a UPS truck backed up to SUBJECT PREMISES 3.  An Asian male wearing glasses, a black sweatshirt with white writing on the back, and black pants helped the UPS driver unload three large brown cardboard boxes from the back of the UPS truck into SUBJECT PREMISES 3.  The UPS driver and the same Asian male carried nine different sized packages from SUBJECT PREMISES 3 towards the back of the UPS truck.

103.    On November 11, 2024, law enforcement observed via video surveillance at approximately 9:19 AM, TARGET VEHICLE 2 arrive and park behind a WM trash container behind SUBJECT PREMISES 3.  At approximately 11:13 am, a FedEx van arrived and the FedEx driver carried approximately 12 large brown boxes into SUBJECT PREMISES 3.  At 4:24 pm, a UPS van pulled up to the back doors at SUBJECT PREMISES 3.  The UPS driver picked up approximately 15, assorted size, brown cardboard boxes from the back of SUBJECT PREMISES 3 and brought them to his UPS truck.

104.    Hundreds, if not thousands, of communications were found on electronic devices (including cell phones and computers) seized from REN, JIANG, WU, and CHEN.  Those communications included photographs, texts, and emails.  Specifically, the primary means of communications was through WeChat, which is a Chinese messaging platform that does not comply with U.S. legal process. These WeChat messages contained strings involving various groups that both purchased and exchanged fraudulently-obtained gift card numbers and PINs.  They also discussed the sale and purchase of electronic devices, namely Apple products. Other conversations included messages about New Hampshire-based warehouses and where to ship and/or bring devises to. There are also numerous discussions mentioning FedEx shipments.  Photographs of pricing charts for the electronics were also found within these WeChat conversations. Based on the investigation thus far, these WeChat communications are

36

not accessible until obtained from the actual devices.

105.    Interviews conducted in this investigation with JIANG, WU, and CHEN revealed that this type of scheme relies heavily on the use of electronic devices to facilitate purchasing and exchanging fraudulent gift card data and the subsequent purchase and shipment of electronics purchased with the gift cards. Additionally, the gift card numbers were frequently purchased through the cryptocurrency Tether, otherwise known as USDT. Cryptocurrencies, like Tether, can only be accessed through electronic devices.

106.    Based on surveillance, as well as information obtained from FedEx, shipping labels were created from user accounts and printed from electronic devices in order for packages sent from the SUBJECT PREMISES to be shipped out. For example, on November 12, 2024, two packages were sent out via UPS in Keene, NH with shipping labels showing a return address of SUBJECT PREMISES 1 and a receiving address in Dubai. U.S. Customs and Border Protection in Louisville, KY conducted a border search of the packages on November 14, 2024. The search showed that the packages contained Apple AirPods.

107.    The return label on the packages listed John Ren, 17819640347, NIUB Tech Inc. ▇▇▇▇▇▇▇. #3, Jaffrey NH 03452. On November 12, 2024, an Automated Export System (AES) was filed with U.S. Customs and Border Patrol for those two packages.  An AES must be filed for all exports valued over $2,500.  The destination listed on the AES was Dubai. An AES can only be filed electronically. The "17819640347" number appears to be JX REN's phone number from toll records.  According to a law enforcement database, the number (781) 964-0347 is a cell phone.  NIUB Tech Inc. has filed 116 AES in 2024 for shipments going all around the world, from South America to the Middle East. Jianxiong Ren (JX REN) or Ren Jianxiong is listed as the primary exporter on 114 of those filings.

108.    Jian Lin (J. LIN) was listed as the primary exporter on an AES on filed on November 16, 2023, with an exporting address of ███████████████, Unit 3-500, Salem, NH. That is the address of the warehouse used by Jinbin Ren.

109.    Throughout this investigation, including through in-person surveillance and review of camera footage, law enforcement officers have observed subjects at SUBJECT PREMISES 1, 2, 3, and 4 using cell phones during deliveries.

110.    During the execution of the search warrants on November 20, 2024, of the locations described above, agents conducted interviews with J. LIN and J. REN.  According to both, they primarily used WeChat to communicate.  J. REN stated that he used WeChat to communicate with his boss in New York and J. LIN stated he used WeChat to communicate with his boss who he believed was in China.  J. LIN only knew this boss as "AP."  The two also stated that WeChat and/or email was used to not only receive labels to ship Apple products, but also communicate with others involved in the acquisition and distribution of Apple products.

111.    J. LIN told agents that he uses a cryptocurrency wallet on his electronic devices to receive the cryptocurrency Tether, which is also known as USDT.  J. LIN stated that the money he used to pay the rent for the warehouses would be sent by "AP" through USDT to J. LIN's cryptocurrency wallet.

112.    J. REN told agents that he uses a bar code scanner that attaches to his mobile device to scan Apple products as well as other codes to ship Apple devices.  The scanner is connected to an application that he uses on his device.  J. REN also told agents that he receives labels to print out on his devices, which are affixed to the packages containing the Apple products to be shipped out.

113.    J. REN said he communicates with Wei Chen using WeChat, and that Wei Chen is responsible for ordering all of the Apple products and directing J. REN and others where to ship the products to after they arrive.  J. REN also told agents that he takes pictures of the count sheets of the devices and sends those to Wei Chen over WeChat.

114.    Finally, J. REN told agents that he lives at ▮▮▮▮▮▮▮▮, Unit 3 in Jaffrey.  In addition to the Jaffrey location, J. REN said that he also utilizes the two Rindge locations (SUBJECT PREMISES 4 and 5) and Wilton (SUBJECT PREMISES 2) to conduct business.

115.    As noted above, J. LIN told agents that he controls both Units 6 and 7 at the Marlboro Road location in Troy and that these are locations where he conducts his shipping business from.

116.    Following the execution of the search warrants on November 20, 2024, FedEx and UPS advised law enforcement that additional packages were received and slated to be delivered at SUBJECT PREMISES 2, 4, and 5.  These packages have been temporarily detained by both FedEx and UPS due to their awareness of the previously executed search warrants.  FedEx and UPS advised that these packages were shipped from Apple at A.I., 102 Goodman Drive, Carlisle, PA 17013.

117.    FedEx is keeping the packages in question at its distribution center at 10 Industrial Drive in Londonderry, NH.  UPS is keeping the packages at its distribution centers at 3 Whipple Street, Nashua, NH, and 39 Cornwell Drive, Keene, NH.

118.    Given the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES will be located in the packages described above.

## CONCLUSION

119.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the packages described in Attachments A-1, A-2, and A-3 to seek the items described in Attachment B.

Respectfully submitted,

/s/      Bradley Nims
Special Agent Bradley Nims
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Talesha L. Saint-Marc
U.S. Magistrate Judge
District of New Hampshire
**Nov 26, 2024**